CHRIST T. TROUPIS, ISB #4549
TROUPIS LAW OFFICE P.A.
801 E. State Street, Ste 50
P.O. Box 2408
Eagle, Idaho 83616
Ph:    (208) 938-5584
Fax:   (208) 938-5482
Email: ctroupis@troupislaw.com

BRYAN D. SMITH, ISB #4411
SMITH, DRISCOLL & ASSOCIATES, PLLC
P.O. Box 50731
Idaho Falls, Idaho 83405
Ph:    (208) 524-0731
Fax:   (208) 529-4166
Email: bds@eidaholaw.com

Attorneys for Plaintiffs


## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF IDAHO

| | |
|---|---|
| BRENT F. REGAN, KAREN B. MASHAK, JEREMY MORRIS, MARIE DeKNIKKER, JASON ROBINSON, KATIE DAVENPORT, LAILA KAMMERMAN, WALTER TRUDO, DANIEL MURDOCH, and SHAWNA MURDOCH, <br><br><br> Plaintiffs, <br><br> vs. <br><br> C.L. "BUTCH" OTTER, Governor Of the State of Idaho, and SHERRI YBARRA, Idaho Superintendent of Public Instruction, and DON SOLTMAN, President of the Idaho State Board of Education, <br><br> Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     CASE NO. <br><br><br> COMPLAINT FOR DECLARATORY RELIEF, PRELIMINARY AND PERMANENT INJUNCTION |

Complaint for Declaratory Relief and
Preliminary and Permanent Injunction                    1

COME NOW PLAINTIFFS BRENT F. REGAN, KAREN B. MASHAK, JEREMY MORRIS, MARIE DeKNIKKER, JASON ROBINSON, KATIE DAVENPORT, LAILA KAMMERMAN, WALTER TRUDO, DANIEL MURDOCH, and SHAWNA MURDOCH, by and through their attorneys, CHRIST T. TROUPIS, and BRYAN D. SMITH, and for their Complaint against Defendants C.L. "BUTCH" OTTER, Governor of the State of Idaho, SHERRI YBARRA, Idaho Superintendent of Public Instruction, and DON SOLTMAN, President of the Idaho State Board of Education, alleges as follows:

## I.  NATURE OF THE ACTION

1.      This case presents an Idaho taxpayer challenge to the illegal expenditure of Idaho public funds to the Smarter Balanced Assessment Consortium ("SBAC"), on the grounds that SBAC is an illegal interstate compact not authorized by the U.S. Congress.  Article I, §3 of the Idaho Constitution recognizes that the U.S. Constitution is the supreme law of the land. The membership of Idaho and other States in the SBAC violates Article I, §10, cl. 3 of the United States Constitution, together with other provisions of Federal and Idaho law. The use of Idaho taxpayer funds to support SBAC, an illegal interstate compact, therefore constitutes an unconstitutional expenditure subject to challenge by Idaho taxpayers.

2.      On June 2, 2010, Governor C.L. "Butch" Otter, together with Tom Luna, the former Idaho Superintendent of Public Instruction and Richard Westerberg, the former President of the Idaho State Board of Education executed a Memorandum of Understanding with the SBAC, and by that act engaged in a course of conduct that delegated Idaho's sovereignty over educational policy within its borders to SBAC, an interstate consortium operating under the influence of federal regulators within the U.S. Department of Education in Washington, D.C.

Congress has never sanctioned the interstate compact that created this consortium. Notwithstanding that fact, Idaho is committed to contribute millions of dollars of taxpayer funds during Fiscal Year 2015 to support this illegal interstate compact. A true and accurate copy of that Memorandum is attached hereto, marked Exhibit A, and incorporated herein by this reference.

3.      On or about August 8, 2014, that Memorandum was replaced with a new Memorandum of Understanding and Agreement with The Regents of the University of California providing that SBAC "will exist under and operate as a part of The UCLA Graduate School of Education and Information Studies, subject to the direction of the Governing Board, to be funded by members paying annual fees to UC, in order to allow the Consortium's work to continue for those members that execute this MOU." A true and accurate copy of that MOU is attached hereto, marked Exhibit B, and incorporated herein by reference.

4.      Plaintiffs are informed and believe that in or about 2010, Governor C.L. "Butch" Otter and Tom Luna, the former Idaho Superintendent of Public Instruction executed a Memorandum of Agreement with two private lobby groups, the Council of Chief State School Officers ("CCSSO") and the National Governors Association Center for Best Practices ("NGO Center") committing the State of Idaho to the development and adoption of the Common Core State Standards. A true and accurate copy of that Memorandum is attached hereto, marked Exhibit C, and incorporated herein by this reference.

5.      Plaintiffs are informed and believe that the United States Congress has never authorized or consented to the creation of the SBAC interstate compact. Notwithstanding this fact, the State of Idaho, as a member of SBAC, has and will continue to disburse millions of

taxpayer dollars to SBAC in Fiscal Year 2015 to support the goals of the illegal interstate compact to adopt the Common Core Standards throughout the United States.

6.      Idaho taxpayers have and will suffer irreparable harm if taxpayer funds continue to be disbursed by the State of Idaho to support SBAC, the illegal interstate compact, before the issues raised in this lawsuit are resolved by the Court.

7.      This lawsuit seeks a declaration that Idaho's participation in the Memorandum of Understanding with SBAC and adoption of the Common Core Standards pursuant to membership in SBAC is unconstitutional and seeks issuance of a preliminary and permanent injunction against the State of Idaho acting by and through Governor C.L. "Butch" Otter, Sherri Ybarra, Idaho State Superintendent of Schools, and Don Soltman, President of the Idaho State Board of Education,  restraining and prohibiting them from making any direct or indirect disbursement of Idaho funds to the SBAC, requiring them to withdraw the State of Idaho from membership in the SBAC and cease implementation of the Common Core Standards.

## II.     PARTIES

8.      Plaintiffs Brent F. Regan, Karen B. Mashak, Jeremy Morris, Marie DeKnikker, Jason Robinson, Katie Davenport and Laila Kammerman are all individuals who are Idaho taxpayers and residents of the State of Idaho.

9.      Plaintiffs bring this action, individually and as a class action pursuant to Rules 23(a) and 23(b), Fed. R. Civ. P., on behalf of all taxpayers in the State of Idaho.

10.      This lawsuit is maintainable as a class action because with respect to such class, (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and

adequately protect the interests of the class.  In addition to the foregoing, the prerequisites of each subsection of Rule 23(b)(1)(B) have been satisfied in this action because (1) adjudications with respect to individual members of the class would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests. (2) The Defendants opposing the class have acted on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.  (3) The questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

11.     Defendant C.L. "BUTCH" OTTER is the duly elected and acting Governor of the State of Idaho and is sued in that capacity.  As the Idaho Governor, C.L. "Butch" Otter is Idaho's chief executive officer. In that capacity, he executed the SBAC Memorandum of Understanding on behalf of the State of Idaho.

12.     Defendant SHERRI YBARRA is the duly elected and acting State Superintendent of Schools for the State of Idaho and is sued in that capacity. The consent of the Idaho State School Superintendent is a required component of the SBAC Memorandum of Understanding to which the State of Idaho is a party. Sherri Ybarra's predecessor, Tom Luna, executed the SBAC Memorandum of Understanding on behalf of the State of Idaho.

13.     Defendant DON SOLTMAN is the duly appointed and acting President of the Idaho State Board of Education and is sued in that capacity. The consent of the President of the Idaho State Board of Education is a required component of the SBAC Memorandum of

Understanding to which the State of Idaho is a party. Don Soltman's predecessor, Richard Westerberg, executed the SBAC Memorandum of Understanding on behalf of the State of Idaho.

## III.   JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343. Declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202. This case presents a federal question involving federally protected rights.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the Plaintiffs and Defendants reside in the District of Idaho, and Defendants' conduct that gives rise to Plaintiffs' claims has and is occurring in the State of Idaho and affects every public school district within the State of Idaho.

## IV.   STATEMENT OF FACTS APPLICABLE TO ALL CLAIMS

16.     Plaintiffs bring this action under Article I, §10, cl. 3 of the United States Constitution, the Compact Clause, for declaratory and injunctive relief, as taxpayers to challenge the unauthorized expenditure of public funds by the State of Idaho under an agreement that hands over the sovereignty of the State of Idaho to a private consortium, which encroaches upon the supremacy of the United States, and thereby deprives Idaho citizens of the protections guaranteed to them by the United States Constitution.

17.     The Compact Clause of the United States Constitution states:

> **"No State shall, without the Consent of Congress … enter into any Agreement or Compact with another State."** U.S. Const. art. I, §10, cl. 3.

18.     The Tenth Amendment to the U.S. Constitution provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people."

19.     It has long been recognized that educational policy is an area of core state competence and concern that is not delegated to the federal government under the Constitution and our system of federalism.

Congress has defined the parameters of the Federal Government's role in elementary and secondary education in the States.

20.     For fifty years, federal statutes have prohibited the Federal Government, and in particular, the Department of Education, from controlling educational policy, curriculum decisions, or educational assessment programs in elementary and secondary education.

21.     Statutes enacted by Congress have manifested its explicit intent that authority and control over the curriculum, programs of instruction, and administration of public schools rests with the States and local educational agencies, and not the Federal Government.

22.     In 1965, Congress enacted the General Education Provisions Act of 1965, 20 U.S.C. §§ 1221 *et. seq.,* which provides:

> "No provision of any applicable program shall be construed to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution, school, or school system, or over the selection of library resources, textbooks, or other printed or published instructional materials by any educational institution or school system." 20 U.S.C. § 1232a.

This restriction was later made applicable to all programs administered by the U.S. Department of Education. 20 U.S.C. § 1221(c)(1).

23.     The Department of Education Organization Act of 1979, 20 U.S.C. §§ 3401 *et. seq.,* which created the U.S. Department of Education, provides:

> "No provision of a program administered by the Secretary or by any other officer of the Department shall be construed to authorize the Secretary or any such officer to exercise any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution, school, or school system, over any accrediting agency or association, or over the selection or content of library

resources, textbooks, or other instructional materials by any educational institution or school system, except to the extent authorized by law." 20 U.S.C. § 3403(b).

24.     The Department of Education Organization Act evinces Congress' clear intent that States and local governments retain control over education policy and decision making. "It is the intention of the Congress in the establishment of the Department to protect the rights of State and local governments and public and private educational institutions in the areas of educational policies and administration of programs and to strengthen and improve the control of such governments and institutions over their educational programs and policies. The establishment of the Department of Education shall not increase the authority of the Federal Government over education or diminish the responsibility for education which is reserved to the States and the local school systems and other instrumentalities of the States. 20 U.S.C. §3403(a).

25.     The Elementary and Secondary Education Act of 1965 ("ESEA"), as amended by the No Child Left Behind Act of 2001 ("NCLB"), 20 U.S.C. §§ 6301 *et. seq.,* provides that:

> "[n]othing in this Act shall be construed to authorize an officer or employee of the Federal Government to mandate, direct, or control a State or local education agency, or school's curriculum, program of instruction, or allocation of State or local resources." 20 U.S.C. § 7907(a).

26.     The ESEA prohibits the Department of Education from using funds under the statute "to endorse, approve, or sanction any curriculum designed to be used in an elementary school or secondary school." 20 U.S.C. §7907(c)(1).

27.     The ESEA further provides that "no State shall be required to have academic content or student academic achievement standards approved or certified by the Federal Government, in order to receive assistance under this Act." 20 U.S.C. § 7907(c)(1).

28.     In enacting the ESEA, Congress contemplated that decisions regarding "the specific types of programs or projects that will be required in school districts" would be "left to

Complaint for Declaratory Relief and
Preliminary and Permanent Injunction                          8

the discretion and judgment of the local public educational agencies." H.R. Rep. No. 143, 89th Congress, 1st Session, 5 (1965).

29.    "The legislative history [of the ESEA], the language of the Act, and the regulations clearly reveal the intent of Congress to place plenary responsibility in local and state agencies for the formulation of suitable programs under the Act." *Wheeler v. Barrera,* 417 U.S. 402, 415-16 (1975), *judgment modified on other grounds,* 422 U.S. 1004 (1975). "There [is] a pronounced aversion in Congress to 'federalization' of local educational decisions." *Id.* at 416.

### Congress declaration that the Federal government shall not interfere with a State's administration of its schools and establishment of curriculums defines the extent of its Constitutional authority under the Spending Clause.

30.    Article I §8, cl. 1 of the United States Constitution, The Spending Clause, states:

"The congress shall have power to lay and collect taxes, duties, imposts and excises, to pay the debts and provide for the common defense and general welfare of the United States."

31.    Article I, §8 of the Constitution limits the Spending Power of the Federal Government to areas within powers enumerated in the Constitution.  Since "education" is not an enumerated power, the only part of Article I, §8 of the United States Constitution that could ostensibly grant authority to the Federal Government over State and local elementary and secondary education is the phrase "general welfare of the United States."  The U.S. Congress has declared that the Federal Government does not have a proper role in interference with a State's sovereignty in the area of elementary and secondary education within its State borders, and that setting policy and directing the administration and curriculums of state and local schools is not a matter of legitimate Federal interest under Article I,§8, and therefore, not within the scope of authority granted to the U.S. Department of Education.

32.     With respect to those powers that are not enumerated, the 10th Amendment to the United States Constitution states:

> "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

**The U.S. Dept. of Education has sought to dictate the curriculums and policies of State and local education contrary to its Constitutional and statutory authority.**

33.     On February 17, 2009, the U.S. Congress enacted the American Recovery and Reinvestment Act of 2009 ("ARRA"). Sections 14005 and 14006 of the ARRA provided for federal grant funding to the states related to education. Section 14005(d)(4) provided for grant funding relating to "standards and assessments," and provided that recipient states would "take steps to improve State academic content standards and student academic achievement standards…" Section 14006 provided for remaining funds to be used as state incentive grants in Fiscal Year 2010 for states "that have made significant progress in meeting the objectives of paragraphs (2), (3), (4), and (5) of section 14005(d)." 123 Stat. 115, 283 (2009) The ARRA did not mention or authorize common state educational standards or "consortia" of states.

34.     Thereafter, in 2009, two private Trade Associations (lobby groups), the National Governors' Association ("NGA") and the Council of Chief State School Officers ("CCSSO"), together with Achieve, Inc., a private nonprofit corporation, created an initiative to develop, and implement among all States, a national, uniform set of educational standards for English language arts and mathematics called the Common Core State Standards. ("Common Core"). Common Core was intended to replace "the existing patchwork of state standards" with a uniform, nationalized set of standards, assessments, and curriculum, which would not vary from State to State. *74 Fed. Reg. 59733 (Nov. 18, 2009)*, Exh. C.

35.     At present, Common Core includes uniform assessment standards for English language arts and mathematics.

36.     Common Core was finalized in or around June, 2010.

37.     As it has been implemented, Common Core has elicited criticism nationwide from parents, teachers, public-policy experts, and elected officials, across the political spectrum. These criticisms have addressed both the substantive content of the Common Core standards and the centralization of our educational system that may result from implementation of these standards. *See, e.g.* Lindsey Burke & Jennifer A. Marshall, *Why National Standards Won't Fix American Education: Misalignment of Power and Incentives,* Heritage Foundation, http://www.heritage.org/research/reports/2010/05/why-national-standards-won-t-fix-american-education-misalignment-of-power-and-incentives; Al Baker, *Common Core Curriculum Now Has Critics on the Left,* N.Y. Times, Feb 16, 2014, available at http://www.nytimes.com/2014/02/17/nyregion/new-york-early-champion-of-common-core-standards-joins-critics.html.

38.     In or about November, 2009, President Obama announced that $4.35 billion of stimulus funds were available to be awarded to states through Race to the Top Grants. On November 18, 2009, the U.S. Dept. of Education issued an invitation to the States to apply for Race to the Top ("RTTT") grant funding, under the ARRA. *74 Fed. Reg. 59836 (Nov. 18, 2009).* The grant invitation conditioned RTTT grant funding, in part, on "[t]he extent to which the State has demonstrated its commitment to adopting a common set of high-quality standards." *Id.* at 59843. To demonstrate the requisite "commitment", a state could (a) "participate in a consortium of States that…is working toward jointly developing and adopting a common set of K-12 standards… and (b) demonstrate its commitment to and progress toward adopting a common set

of K-12 standards …by August 2, 2012…and to implementing the standards thereafter in a well-planned way." *Id.*

39.     To satisfy key criteria for grant funding under RTTT, a state thus had to commit to adopting a "common set of K-12 standards", *i.e.* Common Core.

40.     On or about January 13, 2010, Defendant Governor C.L. "Butch" Otter and Tom Luna, former Idaho State Superintendent of Schools, signed an Application to apply for Federal RTTT funds. The receipt of RTTT grant funding was conditioned, in part, on [t]he extent to which the State has demonstrated its commitment to adopting a common set of high-quality standards," which the State could demonstrate by participating "in a consortium of States…working toward jointly developing and adopting a common set of K-12 standards." As a condition to receipt of these funds, Idaho agreed to adopt the Common Core Standards. True and accurate copies of excerpts from Idaho's RTTT Grant Application are attached hereto as Exhibit F, and incorporated herein by reference. [RTTT Application, pp. 37-49, Appendix A1.1 - Idaho RTTT Memorandum of Understanding, Appendix B2.1- Interstate Agreement between Idaho and Participating Consortium States,  Appendix B2.2a - List of Participating States, Appendix B2.2b - Summative Multi-State Assessment Resources for Teachers and Education Researchers (SMARTER) Memorandum of Understanding, and Appendix B2.3a - Multistate Options for Student Assessment and Instruction Consortium. ("MOSAIC")]

41.     On or about April 9, 2010, the US Dept. of Education announced "scoring priorities" for the RTTT assessment program, which would "provide funding to a consortia of states to develop assessments" aligned with common K-12 standards, *i.e.* Common Core. *See 75 Fed. Reg. 18171 (April 9, 2010).*  To be eligible to receive funding, a consortium of states "must include at least 15 states." *Id.* The criteria required the adoption of "academic content standards

for grades K-12" that are "substantially identical across all States in a consortium." *Id.* at 18177. The criteria further provided that "a State may supplement the common set of … standards with additional content standards, provided that the additional standards do not exceed 15 percent of the State's total standards for that content area." *Id.*  These academic standards had to be fully implemented statewide in each State in the consortium no later than the 2014-2015 school year." *Id* at 18171.

42.     On or about April 14, 2010, the U.S. Dept. of Education issued a second invitation for applications for RTTT funds. *See Fed. Reg. 19496 (April 14, 2010).* This invitation again conditioned RTTT grant funding in part, on "[t]he extent to which the State has demonstrated its commitment to adopting a common set of high-quality standards." *Id.* at 19503.

43.     In response to the RTTT grant invitation, two privately organized entities, the Smarter Balanced Assessment Consortium ("SBAC") and a similar entity called Partnership for Assessment Readiness for College and Careers ("PARCC") were created. In 2010, 31 states, including the State of Idaho, executed a Memoranda of Understanding with SBAC that committed each of the member States to adopt the SBAC Assessments and Common Core State Standards Initiative Assessment Standards – as developed by SBAC – and committed the member States to submit to SBAC's governance structure and collective decision making. A State's membership in SBAC is subject to approval by the U.S. Dept. of Education.

44.     On June 23, 2010, the State of Washington – acting on behalf of SBAC and its member states, which included the State of Idaho, -- applied to the U.S. Dept. of Education for an RTTT grant. SBAC's grant application stated that SBAC would develop a uniform "multi state assessment system based on the SBAC and the Common Core State Standards Initiative State Standards" and further stated that "the role of "SBAC" is to influence and support the

Complaint  for Declaratory Relief and
Preliminary and Permanent Injunction                    13

development and implementation of learning and assessment systems to ***radically reshape the education systems in participating States.*** *Application, p. 5, 18.* (Emphasis added.) True and accurate copies of excerpts from that Application are attached hereto, marked Exhibit D, and incorporated by reference herein.

45.     SBAC's RTTT application explained that "each member State is responsible for adopting the CCSS [*i.e.* Common core] no later than December 31, 2011, and each State that is a member of the Consortium in 2014-2015 will also be responsible for adopting common achievement standards and fully implementing Statewide, no later than the 2014-2015 school year, the Consortium's summative assessment in grades 3-8 and high school, for both English language arts and mathematics. In addition, all member States are expected to adhere to the governance as outlined in the Memorandum of Understanding [and] support the decisions of the Consortium..." Exhibit D, p. 22.

46.     On September 2, 2010, the U.S. Dept. of Education awarded SBAC a grant totaling approximately One Hundred Fifty Nine Million Dollars ($159,000,000.00), plus a supplemental award of over $15 million to "help participating States successfully transition to common standards and assessments." SBAC executed a Cooperative Agreement with the Dept. of Education as part of the grant award conditions. In accordance with 34 CFR 75.234(b), the award was classified as a cooperative agreement and included substantial involvement on the part of the Department of Education.  The Agreement provided for substantial federal involvement and influence in SBAC's operations. SBAC funding expired in 2014. Now SBAC is financed through direct payments from Idaho and other member states in the form of "membership fees." Idaho is a current member of SBAC. In conjunction with the issuance of the grant to SBAC, the Dept. of Education entered into a Cooperative Agreement with SBAC and

the State of Washington. A true and accurate copy of that Agreement is attached hereto, marked Exhibit E, and incorporated herein by this reference.

47.     On September 2, 2010, the U.S. Dept. of Education awarded PARCC a grant totaling approximately One Hundred Seventy Million Dollars ($170,000,000.00) to develop "new, common assessment systems". PARCC executed a Cooperative Agreement with the Dept. of Education as part of the grant award conditions. The Agreement provides for substantial federal involvement and influence in PARCC's operations. PARCC funding expired in 2014. Now PARCC is financed through direct payments from member states in the form of "membership fees." Idaho is not a member of PARCC.

48.     Plaintiffs are informed and believe that in order to join the SBAC, each State's Governor and Commissioner or Superintendent of Education, (and the President of the State School Board, if applicable) were required to sign a Memorandum of Understanding ("MOU"). The Memorandum of Understanding includes conditions of membership that require each State to surrender some of its sovereign decision-making authority with respect to educational programs within the state to the SBAC, a private entity comprised of member states, including the State of Idaho.

49.     The U.S. Department of Education's actions in conditioning the grant of billions of dollars of federal funds to the states under RTTT with a requirement that the States join either SBAC or PARCC, interstate compacts, and agree to implementation of common uniform educational standards ("the Common Core Standards") in cooperation with SBAC, or PARCC, private interstate consortia, contravenes the express legislative intent and directives of the U.S. Congress, and constitutes an unconstitutional exercise of the Spending Power under Article I, §8 of the U.S. Constitution.

The State of Idaho was induced to join SBAC and adopt the Common Core
Standards by the conditions of the U.S. Dept. of Education RTTT grants.

50.     On June 2, 2010, Governor C.L. "Butch" Otter, Idaho State Superintendent of

Schools Tom Luna, and Idaho State Board of Education President Richard Westerberg executed

a Memorandum of Understanding with the Smarter Balanced Assessment Consortium ("SBAC"

or "Consortium"). Exhibit A. The Memorandum of Understanding purports to commit Idaho to:

(a)     "Adopt common achievement standards no later than the 2014-2015 school year;"

(b)     "Fully implement statewide the Consortium summative assessment in grades 3-8

and high school for both mathematics and English language arts no later than the 2014-2015

school year";

(c)     "Adhere to the governance as outlined in [the Memorandum of Understanding]";

(d)     "Agree to support the decisions of the Consortium";

(e)     "Agree to follow agreed-upon timelines";

(f)     "Be willing to participate in the decision-making process and, if a Governing

state, final decision"; and

(g)     "Identify and implement a plan to address barriers in State law, statute, regulation,

or policy to implementing the proposed assessment system and to addressing any such barriers

prior to full implementation of the summative assessments components of the system." *Id.* at 3.

51.     The memorandum of Understanding also purported to commit Idaho to submit to

the Governance Structure of the SBAC consortium. *Id.* at 7-10.

52.     The Memorandum of Understanding also purported to commit Idaho to comply

with specific procedures for request and approval before exiting from the consortium. *Id.* at 12.

53.     The Memorandum of Understanding also purported to commit Idaho to "identify

existing barriers in State laws, statutes, regulations, or policies" to the implementation of

Preliminary and Permanent Injunction                    16

statewide assessments aligned with Common Core, along with "the plan to remove the barrier." *Id.* at 13.

54.     The Memorandum of Understanding also purported to commit Idaho to agree to a "financial plan" that would become effective by "September 1, 2014," that would "include as revenue at a minimum, State contributions" to SBAC, among other sources of funds, to fund SBAC after federal grant funding had expired. *Id.* at 5.

55.     By executing the Memorandum of Understanding, Governor Otter, State School Superintendent Luna, and State School Board President Westerberg purported to "agree that Idaho would be bound by" its terms. *Id.* at 15.

56.     The Memorandum of Understanding provided for the creation of "[a] representative governance structure" and purportedly authorized that "governance body" to "make any changes [to the Memorandum of Understanding's provisions] as necessary through a formal adoption process." *Id.* at 5.

57.     On information and belief, officials of the other states that were members of SBAC at the time of its application executed Memoranda of Understanding with SBAC similar or identical to the Memorandum of Understanding signed by Idaho officials.

58.     On information and belief, in 2010, SBAC had 30 member states, including the State of Idaho. By 2015, that number had shrunk to 18 member states, with 3 states considering withdrawing. In 2010, PARCC had 23 member states and the District of Columbia. As of July 2015, that number had shrunk to 8 member states and the District of Columbia. At the present date, 26 States and the District of Columbia are members of either SBAC or PARCC, and 24 States are not members of either consortium.

59.     SBAC operates with closed meetings and purports to be exempt from both state and federal open-records laws. SBAC also prevents teachers administering its assessments from reviewing the assessments. SBAC is thus insulated from any public accountability.

60.     The RTTT Assessment program, in effect, granted a near monopoly over K-12 educational standards in English language arts and mathematics to Common Core, making it extremely difficult for the minority of non-Common Core states to decline to adopt Common Core, and making it extremely difficult for States to opt out of Common Core.

61.     In or about 2010, Defendant Governor C.L. "Butch" Otter and Tom Luna, former Idaho State Superintendent of Schools, also signed a "Memorandum of Agreement" with the NGA and CCSSO committing the State of Idaho to adopt the Common Core Standards. The Memorandum disclosed the federal government's role in implementation of the Common Core Standards as follows: "In particular, the federal government can provide key financial support for this effort in developing a common core of state standards and in moving toward common assessments, such as through Race to the Top Fund authorized in the American Recovery and Reinvestment Act of 2009 (ARRA)." "Further, the federal government can incentivize this effort through a range of tiered incentives…Additionally, the federal government can provide additional long-term financial support for the development of common assessments, teacher and principal professional development, other related common core standards, and a research agenda that can help continually improve the common core over time." Exh C, p. 3.

62.     On January 7, 2011, SBAC executed a "Cooperative Agreement" with the U.S. Department of Education that provided for substantial federal involvement and control over the work of SBAC. Among other things, it provided for federal involvement to "ensure project consistency with …Department goals and objectives," and granted to a federal program officer

authority to "review and approve modifications to the design of activities proposed under this Agreement." Exh. E, p. 1, 10.

63.    Plaintiffs are informed and believe that SBAC operates under the direct influence and/or direction of the U.S. Department of Education. As alleged herein, federal regulators provided financial support to SBAC to develop and implement Common Core Standards and provided financial incentives to States conditioned upon each State's agreement to adopt the Common Core Standards, and submit to the Governance of SBAC Consortium.

64.    The U.S. Congress never authorized, ratified, approved, or otherwise consented to SBAC, whether directly or indirectly.

65.    SBAC's lack of ratification by Congress represents a departure from historical practice. For example, the Education commission of the States ("ECS") was created in 1965 for purposes similar to those of SBAC.  It took the form of an interstate compact that was approved by Congress. ECS created and, for many years, administered the National Assessment of Educational Progress ("NAEP") tests, which were designed to assess the knowledge of American students in core subjects, much like the SBAC assessments. Unlike SBAC, Congress expressly consented to ECS.

66.    Congress has ratified and approved numerous other interstate compacts with far less far-reaching effects than those of SBAC.  These include, among many others, the Driver License Compact, which allows states to exchange information about driving infractions committed in other states; the Bi-State Development Agency, created by compact between Missouri and Illinois, which administers public transportation in Metropolitan St. Louis Region; and the New Hampshire-Vermont Interstate School Compact, which permits the formation of

interstate school districts between New Hampshire and Vermont. Unlike SBAC, Congress has expressly consented to all of these interstate compacts.

### SBAC is an interstate consortium subject to the requirement of Congressional consent under Article I,§10, cl. 3 of the U.S. Constitution.

67.    **The State of Idaho Submitted to the SBAC's governance.**  Under the terms of the SBAC Memorandum, the State of Idaho submitted to the "governance structure" of the Consortium.  The Consortium's goal was to build "a system of assessment based upon the Common Core Standards in English language arts and mathematics." Exh. A, p. 2. To accomplish that end, the SBAC governance structure assigns roles to member States as Governing or Advisory States, and establishes an organizational Structure that includes a Steering Committee, Executive Committee and Work Groups. The vast majority of substantive decisions regarding SBAC's operations are made by its Executive Committee, without the approval or input of member States. The SBAC's Governance Structure establishes an organization with its own decision making bodies, staff, and policies that have and will dictate educational standards to all member States. On January 30, 2015, the SBAC revised its Governing Board Procedures which maintained the same governance structure and original conditions of Membership. A true and accurate copy of that Governance document is attached hereto, marked Exhibit G, and incorporated herein by reference.

68.    **The State of Idaho delegated its sovereign powers to the SBAC.** Plaintiffs are informed and believe that by entering into the SBAC, each State, including the State of Idaho, delegated its sovereign powers with respect to educational policies and assessments to the Consortium. Under the terms of its Memorandum of Understanding, the State of Idaho is not free to adopt or reject the rules and regulations of SBAC.  Each member State, including the State of Idaho has committed to implementing the assessments created by SBAC based upon the

Common Core Standards Initiative. The Memorandum provides that "Each State agrees to …Adopt the Common Core Standards, which are college- and career-ready standards, and to which the Consortium's assessment system will be aligned, no later than December 31, 2011."

Each member State, including the State of Idaho, has agreed to "support the decisions of the Consortium,' 'to follow agreed upon timelines,' and 'to adhere to the Governance'" as outlined in the Memorandum of Understanding. Exh. A, p. 3.

69.     The decisions of the Consortium can often be made by SBAC's Executive Committee without any approval or feedback by member States. Even decisions put to a vote of the Member States do not require unanimity, but only a simple majority. Exh. A, pp. 7-9. Under this structure, SBAC and some member States can dictate educational assessment decisions, even to member States that vote against a proposal. Thus, by joining the Consortium, Idaho and other member States have delegated to SBAC a significant portion of their sovereign authority over educational assessment decisions within the State of Idaho.  Such decisions have traditionally been committed to State sovereignty under the 10th Amendment to the United States Constitution.

70.     **SBAC restricts States from withdrawing from the interstate Compact.**  The SBAC Memorandum of Understanding prevents member States from unilaterally withdrawing from the Consortium. Instead, the Governance Structure provides that a member State must comply with an "exit process" in order to withdraw from the Consortium. Under that process, the member State must "submit in writing its request to leave the Consortium and reasons for the exit request", which request is subject to review and approval by SBAC's executive committee. Exh. A, p. 12.

71.     The "exit process" requirement poses a genuine restriction on State sovereignty because membership in the Consortium and implementation of the SBAC Assessments based upon adoption by the member States of the Common Core Standards is tied to receipt of federal monies through RTTP grants. States seeking RTTP grants must execute a "binding agreement" that "binds each member of the consortium to every statement and assurance made in its application."

72.     As alleged further below, the U.S. Dept. of Education has also imposed de facto sanction on withdrawal from the RTTT consortia, such as SBAC, by threatening the NCLB waivers of states who do not adopt the Common Core standards or their equivalents.

**The SBAC Consortium exercises powers that no individual State could exercise on its own.**

73.     SBAC exercises powers that the individual States could not exercise on their own. SBAC permits its member States, through the consortium, to dictate the educational assessment policies of other member States, including those states that dissent from the consortium's policies. No other State can dictate the educational assessment policies that the State of Idaho implements, except through the Consortium. Similarly, Idaho can only dictate the educational assessment policies of other States only through the Consortium.

**SBAC violates Article I, §10, cl.3 of the U.S. Constitution because it was created without the consent of Congress, and encroaches upon the supremacy of the United States in violation of the U.S. Constitution.**

74.     Plaintiffs are informed and believe that the United States Congress has not enacted any legislation or resolution granting its consent to the State of Idaho or any other State to enter into the interstate consortium known as the Smarter Balanced Assessment Consortium ("SBAC"). The U.S. Congress has never directly or indirectly authorized, ratified, approved, or otherwise consented to SBAC.

Preliminary and Permanent Injunction                          22

75.     Plaintiffs are informed and believe that the State of Idaho uses taxpayer funds –as "membership fees" to enroll in SBAC, (*See MOU, Ex. B, p. 1, F, Exh A. to MOU @ p. 22-23, $1,943,690.20 FY 2014 Annual Fees)* and has executed a Memorandum of Understanding that subordinates the State of Idaho's sovereignty in decision-making over the administration of Idaho's educational systems, and binds the State of Idaho to decisions made by a collective group of member States about the administration of Idaho's educational systems, without the prior consent of Congress. The foregoing actions of the State of Idaho constitute an unlawful interstate compact in violation of the U.S. Constitution.

76.     By financially underwriting, influencing and/or directing SBAC, and inducing and coercing States to adopt the Common Core Standards through financial incentives and penalties, the U.S. Dept. of Education has violated the clear directive of Congress as to the limits of the proper role of the Federal Government with regard to State elementary and secondary education, and has exceeded its Federal authority under Article I, §8, cl.1 of the United States Constitution.

77.     Education policy is an area of core state competence and concern that is not delegated to the Federal Government under Article I,§8 of the U. S. Constitution and therefore is reserved to the States and/or the people by the 10th Amendment to the U.S. Constitution.

**The Federal Department of Education coerces States to remain committed to Common Core by Threatening the States' No Child Left Behind Waivers.**

78.     On September 23, 2011, the U.S. Department of Education announced the No Child Left Behind Waiver Plan (NCLB Waiver Plan). Under the NCLB Waiver Plan, the Department will waive several onerous requirements under the ESEA in exchange for agreements that the applicant-states comply with certain conditions aimed at implementing

changes in school curricula and assessment systems. *See* U.S. Dept. of Ed., ESEA Flexibility Policy Document, http://www.ed.gov/esea/flexibility/documents/esea-flexibility-acc.doc.

79.     The Conditional NCLB Waiver Plan has no statutory authority under the ESEA or elsewhere in federal law.  The Dept. of Education acknowledged that the waiver program operates "in a manner that was not originally contemplated by the No Child Left Behind Act of 2001." *Id.*

80.     Under the Dept. of Education requirements, in order to receive an NCLB waiver, a state "must demonstrate that it has college-and career ready expectations for all students in the State by adopting college-and career-ready standards in at least reading/language arts and mathematics, transitioning to and implementing such standards statewide for all students and schools, and developing and administering annual, statewide, aligned, high-quality assessments, and corresponding academic achievement standards, that measure student growth in at least grades 3-8 and at least once in high school." *Id.*

81.     By exercising such control over common standards and assessments, the Department of Education is exercising control over curriculum in public schools nationwide. Control over standards and assessments, which constitutes de facto control over curriculum, since schools must align their curriculum to meet the standards and assessments.

82.     By conditioning the waiver of NCLB's onerous requirements on the adoption of curriculum and assessment-system changes aligned with the Common Core or its functional equivalent, the U.S. Department of Education has sought to coerce the states into adopting those changes rather than risk possible loss of federal funding under ESEA and NCLB. The source and implementation mechanism of the Common Core Standards are the RTTT-created consortia, SBAC and PARCC.

83.     Plaintiffs are informed and believe that the purpose and effect of the federal regulatory scheme implemented through education funding for "standards and assessments under the American Recovery and Reinvestment Act of 2009 ("ARRA") §14005(d)(4), 123 Stat. 115, 283 (2009), the RTTT grants, and NCLB waivers has been (1) to induce the States to create a system or systems of standards and assessments based on and aligned with the Common Core; and then (2) to compel the States to adopt the Common Core-aligned standards, assessments and corresponding curriculum through NCLB waivers and other financial measures.

84.     Under federal regulations promulgated by the Department of Education, the adoption of a "common set of K-12 standards" requires a commitment of 85% of the State's standards. *See* 74 Fed. Reg. 59838 (Nov. 18, 2009) ("A state may supplement the common standards with additional standards, provided that the additional standards do not exceed 15 percent of the State's total standard for that content area.") The implementation of Common Core, and assessments aligned with Common Core, would thus effectively create a national curriculum in the covered subject areas, in contravention to federal law.

85.     The purpose and effect of the NCLB waiver program is to impose pressure upon States to force them to align their state curricula to a federalized curriculum aligned to Common Core.

86.     By reason of these facts, SBAC and PARCC are instruments of the U.S. Department of Education that were designed to implement a national curriculum through the creation of interstate compacts in circumvention of fifty years of explicit Congressional policy and numerous federal statutes. These entities threaten the valid supremacy of the U.S. Congress over regulatory policy, and threaten the sovereignty of both member States and non-member States over educational curriculum and policy within their states, by placing extreme pressure on

Complaint for Declaratory Relief and
Preliminary and Permanent Injunction                                    25

all States to align their curricula to Common Core. Through the mechanism of the SBAC and PARCC interstate compacts, Idaho and other states, with and through the cooperation, coordination, and inducement of the U.S. Department of Education, are encroaching upon and impairing the supremacy of the United States by promulgating a national policy on education, and encroaching upon and impairing the constitutional authority of the United States Congress to determine the appropriate course of the federal government with respect to a national policy for education. The U.S. Congress has, through legislative enactments prohibiting the U.S. Department of Education from interfering with state and local education decisions, evinced its clear legislative intent that the federal government, and in particular, the U.S. Department of Education, shall not be involved in the development and administration of curriculums in schools operated by the state and local governments, or private entities.

87.     SBAC is an illegal interstate compact created without the consent of the U.S. Congress, which not only encroaches upon and impairs the sovereignty of the United States, but also encroaches upon and impairs the sovereignty of individual states over the education policy within their respective borders.

88.     SBAC has impaired the sovereignty of non-member states over the education policy within their respective borders because the adoption of common core standards by a substantial number of states has resulted in use of those standards in the ACT and SAT Tests taken by students applying for admission to most, if not all, U.S. colleges and universities. As a result, public and private schools within states that have elected not to join SBAC, or who have withdrawn from membership in SBAC, have been forced to adopt and/or retain the common core standards in their curriculums in order to adequately prepare their students to take college admission tests based upon those standards. Students who attend schools that have not adopted

Complaint for Declaratory Relief and
Preliminary and Permanent Injunction                          26

the common core standards are and will be at a severe disadvantage with regard to their ability to apply for admission to colleges and universities by reason of these facts.

### Defendants plan imminent future payments of Idaho Funds to SBAC.

89.     Defendants plan and intend to make imminent future payments of Idaho taxpayer funds to SBAC, in the form of "membership fees" and/or other payments.

90.     The Memorandum of Understanding executed by Governor C.L. "Butch" Otter and Tom Luna, former State Superintendent of Schools, provides that a financial plan will be approved by September 1, 2014 by the Governing States that will "ensure the Consortium is efficient, effective and sustainable. The plan will include as revenue at a minimum, State contributions." Exh. A, p.5, ¶ 13.

91.     Plaintiffs are informed and believe that federal grant funding for SBAC expired in or about the end of September, 2014. Since that date, SBAC has moved its operations to the University of California at Los Angeles ("UCLA"), and is now operating with funds contributed by Idaho and other member States in the form of "membership fees." These fees do not include payments made by Idaho and other member States to third-party vendors to purchase testing materials and services.

92.     Plaintiffs are informed and believe that the Idaho fiscal 2015 - 2016 Budget includes a $2.7million membership payment to SBAC and approximately $3.3 million payment to SBAC for Idaho student testing. In fiscal 2016-2017, the payment for student testing is estimated to increase to $3.5 million.

93.     Plaintiffs are informed and believe that the Idaho State Department of Education has aligned the Idaho Core Standards to the SBAC System commencing in Spring, 2015. Idaho

schools did not give the Idaho Standards Achievement Test (ISAT) in the 2013-2014 school year as part of the transition to implementation of the SBAC Assessment System in Spring, 2015.

94.     As of September 28, 2015, Idaho remains a member of SBAC and a Governing State within the consortium.

95.     Payments of Idaho funds are being made, or soon will be made, from the State's treasury to SBAC in the form of membership fees and/or in the form of other payments, whether directly or indirectly, to SBAC.

## CLAIMS FOR RELIEF

### COUNT I – FOR DECLARATORY RELIEF THAT
### THE SMARTER BALANCED ASSESSMENT CONSORTIUM
### CONSTITUTES AN INTERSTATE COMPACT OF STATES
### TO WHICH CONGRESS HAS NOT CONSENTED
### WHICH VIOLATES ARTICLE I, §10, CL.3
### OF THE U.S. CONSTITUTION

96.     Plaintiffs re-allege and incorporate by reference the allegations of Paragraphs 1-95, inclusive, as though set forth herein in full.

97.     Plaintiffs' rights, status, or other legal relations are affected by the disbursement of funds from the Idaho treasury to SBAC, and by the actions of the Defendants, as more fully set out in this Complaint.

98.     An actual controversy, ripe for adjudication, currently exists between Plaintiffs and Defendants as to whether SBAC is illegal and void under federal law and whether Idaho taxpayer funds may be lawfully disbursed to SBAC, directly or indirectly.

99.     Plaintiffs seek a declaratory judgment establishing the unconstitutionality of these expenditures by the State of Idaho. Plaintiffs are entitled to a further declaratory judgment that Idaho's membership in SBAC is an unconstitutional exercise of the power of the Executive Branch of Idaho State Government because it delegates away Idaho's sovereignty to a private third party entity and/or other States.

100.    SBAC is an private entity consortium constituting an illegal interstate compact between Idaho and 17 other member States.

101.    SBAC constitutes an interstate compact between States that requires Congressional approval under Article I, §10, cl. 3 of the United States Constitution. The following five (5) factors are present in SBAC that are the key indicia of such an interstate compact. They are:

    a.   The existence of independent governance structure;

    b.   The delegation of sovereign power to the compact;

    c.   Restrictions on withdrawing from the compact, and

    d.   The compact's exercise of powers that the states could not exercise individually.

    e.   The compact encroaches upon or impairs the supremacy of the United States.

102.    The United States Congress did not directly or indirectly consent, approve, ratify or authorize the creation of SBAC or its operations, and therefore its existence and operation violate the Compact Clause of Article I, §10, cl. 3 of the U.S. Constitution.

103.    SBAC's existence, purpose, function, activities, governance, and manner of operation violate federal statutes guaranteeing state and local control of curriculum, programs of instruction, and related matters in public schools, including those set forth herein;

104.    SBAC was created through a course of conduct by the U.S. Department of Education, in collaboration with the Defendants such as Governor Otter, that violated the doctrine of unconstitutional conditions and the sovereignty over educational policy guaranteed to the State of Idaho and other States by the doctrine of federalism and the Tenth Amendment.

105.    The putative commitments of Governor Otter, State Superintendent Luna, and State School Board President Westerberg to align Idaho educational policy to SBAC were made in violation of Idaho and federal law. Any putative contractual or other obligation of the State of Idaho to make any direct or indirect payment to SBAC is void and unenforceable under Idaho and federal law.

106.    The creation and operation of SBAC also violates numerous federal statutes that prohibit the federal Department of Education from instituting a national curriculum. The General

Education Provisions Act, ("GEPA") Department of Education Organization Act,("DEOA") and Elementary and Secondary Education Act ("ESEA") all include provisions substantially in the form as the following provision of the GEPA:

> "No provision of any applicable program shall be construed to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution, school or school system." 20 U.S.C. §1232a.

107.   Article I, §8, cl. 1 of the United States Constitution defines the Spending Power of the Federal Government. That power is restricted to the defined enumerated powers. The Tenth Amendment to the United States Constitution reserves to the States or the people, all powers not enumerated.

108.   Because Congress has declared that directing state and local education is not a matter of legitimate federal interest, conditioning the grant of federal funds under RTTT with a requirement that State's implement common uniform educational standards in cooperation with a private consortium, SBAC and the Common Core State Standards Initiative, is an unconstitutional exercise of the Spending Power, and encroaches upon the supremacy of the United States and legitimate authority of the U.S. Congress in determining the appropriate role of the federal government in education.

109.   Idaho executed a Memorandum of Understanding with SBAC committing the State to adopt the SBAC and the Common Core State Standards Initiative Standards, and surrendered considerable decision-making authority to SBAC. Plaintiffs are informed and believe that when its Federal Grant money expired in September 2014, SBAC required each state to pay "membership fees" to enrol students in SBAC as well as additional fees to register for the SBAC tests. Plaintiffs are further informed and believe that Idaho entered into a subsequent Memorandum of Understanding with SBAC obligating Idaho to pay "membership fees" each

year from taxpayer funds for Idaho students to enrol in SBAC and an additional fee to register

Idaho students to take the SBAC Assessment tests. The amount of those payments to SBAC in

fiscal 2015-2016 totalled $2.7 million "membership" fees and approximately $3.3 million testing

fees.

110.    Idaho surrendered its sovereignty over educational policy and curriculum to

SBAC when it agreed to allow SBAC's executive board to determine what standards would be

imposed on Idaho students, and agreed to restrict the State's right to withdraw from the

consortium upon approval of the SBAC Executive Board.

111.    The Department of Education's RTTT grants conditioned on State's

implementing the SBAC and the Common Core State Standards Initiative Standards imposes

unconstitutional conditions on the receipt of federal funds, and do not serve a legitimate federal

purpose, since the Dept. of Education is prohibited by Congress from direction, supervision or

control of state and local education.

112.    Disbursement of Idaho taxpayer funds to SBAC is an unconstitutional and

wasteful expenditure that harms Plaintiffs as taxpayers of the State.

113.    Pursuant to 42 U.S.C. §1983 *et. seq.,* Plaintiffs are entitled to declaratory

judgment declaring their rights and to their reasonable attorneys' fees and costs in this case.

### COUNT II – FOR INJUNCTIVE RELIEF TO PREVENT THE DEPRIVATION OF PLAINTIFFS' RIGHTS AS TAXPAYERS THROUGH THE UNLAWFUL DISBURSEMENT OF IDAHO TAXPAYER FUNDS

114.    Plaintiffs re-allege and incorporate by reference the allegations of Paragraphs 1-

113, inclusive, as though set forth herein in full.

115.    The continued membership of the State of Idaho in SBAC and disbursement of

Idaho taxpayer funds to SBAC and for implementation of the Common Core Standards Initiative

in Idaho constitutes an imminent and ongoing threat by the State of Idaho acting by and through Defendants C.L. "Butch" Otter, Governor, Sherri Ybarra, State Superintendent of Schools, and Don Soltman, President of the Idaho State Board of Education, to deprive the Plaintiffs and all other Idaho taxpayers of public moneys of the State of Idaho.

116.    Disbursement of Idaho taxpayer funds to SBAC is not only an *ultra vires* exercise of power by Defendants but also an unconstitutional and wasteful expenditure of government resources that harms Plaintiffs as taxpayers of the State.

117.    Plaintiffs lack an adequate remedy at law, and therefore seek to have the Court permanently enjoin Defendants, and each of them, and all those in active concert or participation with them, from taking any action to authorize, permit, or allow the disbursement of Idaho taxpayer funds to SBAC.

118.    Plaintiffs are entitled to preliminary and permanent injunctive relief mandating that the State of Idaho acting by and through C.L."Butch" Otter, Governor, Sherri Ybarra, State Superintendent of Schools, and Don Soltman, President of the Idaho State Board of Education immediately withdraw from SBAC and cease the State of Idaho's implementation of the Common Core Standards in Idaho.

**COUNT III – FOR DECLARATORY RELIEF THAT
THE ADOPTION OF COMMON CORE STANDARDS
BY SOME OF THE STATES THROUGH THE
SMARTER BALANCED ASSESSMENT CONSORTIUM
HAS INFRINGED THE PARENTS' FUNDAMENTAL RIGHT TO DETERMINE
THE CARE, CUSTODY AND CONTROL OF THEIR CHILDREN
GUARANTEED BY THE DUE PROCESS CLAUSE OF
THE FOURTEENTH AMENDMENT
TO THE U.S. CONSTITUTION**

119.    Plaintiffs re-allege and incorporate by reference the allegations of Paragraphs 1-118, inclusive, as though set forth herein in full.

120.    The State of Idaho has adopted the Common Core Standards in compliance with its Memorandums of Agreement with SBAC and the NGA and CCSSA.  The State of Idaho is prohibited from directly or indirectly mandating the curriculum of private schools and home schools under the First, Fifth, and Fourteenth Amendments to the United States Constitution.

121.    The adoption of the Common Core Standards by the State of Idaho in conjunction with its membership in SBAC has the intended and actual consequence of compelling private schools and home schools to adopt and teach the Common Core standards as their curriculum. Because Idaho and other states have acted collectively through SBAC to adopt the Common Core standards in 18 states, these same standards have also been adopted in the formulation of college entrance exams used for entrance to colleges and universities throughout the United States. Students who attend private schools or are home schooled and who have not been taught the Common Core standards are at an inherent disadvantage *vis-à-vis* students in public schools who are taught under the Common Core standards, with regard to taking entrance exams based on and aligned with those standards, and required for admission to many U.S. Colleges and Universities.

122.    The purpose and intent of SBAC was to compel the uniform adoption of the Common Core standards by all educational institutions, including private schools and home schools. By making the ability to compete effectively for entrance into college dependent upon adoption of the Common Core Standards, the State of Idaho has interfered with the fundamental rights of parents to choose how to educate their children, and has denied those parents and students the Equal Protection of the law, by indirectly dictating the course of instruction to be taught in those educational forums.

123.    The Fourteenth Amendment to the U.S. Constitution, Section 1, provides in
pertinent part that:

> No State shall make or enforce any law which shall abridge the privileges or immunities
> of citizens of the United States; nor shall any State deprive any person of life, liberty, or
> property, without due process of law; nor deny to any person within its jurisdiction the
> equal protection of the laws.

124.    Plaintiffs are entitled to declaratory judgment establishing that the *de facto*
mandate compelling the teaching of the Common Core standards in non-public schools and
home schools is an unconstitutional exercise of state power that denies parents freedom of choice
in educating their children and infringes upon their liberty interests protected under the Due
Process of the laws under the Fourteenth Amendment to the United States Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

1.    Issue a declaratory judgment that the Memorandum of Understanding between the
State of Idaho and SBAC constitutes an unlawful interstate compact in violation of Article I,
§10, cl. 3 of the United States Constitution.

2.    Issue preliminary and permanent injunctive relief, without bond, restraining and
enjoining the Defendants, and all those in concert or participation with them, from taking any
action to authorize, permit or allow the disbursement of Idaho taxpayer funds to SBAC, or allow
the State of Idaho to continue to serve as a member of SBAC and/or support SBAC's operations,
directly or indirectly, with Idaho taxpayer funds;

3.    Issue preliminary and permanent injunctive relief, without bond, restraining and
enjoining the State of Idaho, acting by and through Defendants C.L."Butch" Otter, Governor,
Sherri Ybarra, State Superintendent of Schools, and Don Soltman, President of the Idaho State
Board of Education Secretary of State, together with their agents, employees, appointees or

Complaint  for Declaratory Relief and
Preliminary and Permanent Injunction                              35

successors and all those acting in concert and participation with him from the enforcement, operation and execution of the State's membership in SBAC;

4.  Declare that SBAC is illegal and void as an entity whose existence, activities, and operation violate the U.S. Constitution, and federal and Idaho law.

5.  Declare that any putative obligations of Idaho to SBAC are illegal, void, and unenforceable under federal and Idaho law;

6.  Declare that no Idaho taxpayer funds may be lawfully disbursed to SBAC, whether directly or indirectly;

7.  Award Plaintiffs' attorneys' fees, costs and expenses pursuant to 42 U.S.C. §1988; and applicable Idaho law; and

5.  Grant such further relief as this Court deems just and proper.

Dated: September 28, 2015.


TROUPIS LAW OFFICE, P.A.

By _____
      Christ T. Troupis
      Attorneys for Plaintiffs

SMITH DRISCOLL & ASSOCIATES, PLLC

By _____
      Bryan D. Smith
      Attorneys for Plaintiffs


Complaint for Declaratory Relief and
Preliminary and Permanent Injunction